## VEZINA v. UNITED STATES et al.

(Circuit Court of Appeals, Eighth Circuit. August 15, 1917.)

### No. 4725.

1. INDIANS ⬤1—PERSONS ENTITLED TO ALLOTMENTS AS INDIANS—EVIDENCE.
    In a suit to establish plaintiff's right to an allotment of land in the White Earth Indian reservation, evidence *held* to show that plaintiff was by blood a member of a band of the Chippewa Indians of Lake Superior.

2. INDIANS ⬤1—PERSONS ENTITLED TO RIGHTS OF INDIANS—ABANDONMENT.
    Under Act June 7, 1897, c. 3, 30 Stat. 90 (Comp. St. 1916, § 4106), providing that all children born of a marriage between a white man and an Indian woman by blood, where such Indian woman is, or was at the time of her death, recognized by the tribe, shall have the same rights and privileges to the property of the tribe to which the mother belonged as any other member of the tribe, where plaintiff's mother, until her marriage to a white man, was fully recognized as a member of a band of Chippewa Indians, and there was nothing to indicate that she ceased to be so recognized up to the time of her death, plaintiff was entitled to be recognized and treated as a member of such band of Indians, though she did not remain with the tribe on their reservation, especially as an Indian, who has abandoned his tribe and taken up his abode among the white race, and recognizes no authority over him except that of the United States and the state in which he resides, cannot become a citizen of the United States, in the absence of a statute or treaty, and forfeiture of tribal citizenship by one who cannot acquire any other citizenship should not be found upon light and trifling circumstances.

Appeal from the District Court of the United States for the District of Minnesota.

Suit by Elizabeth Vezina against the United States and S. E. Mooers. From a judgment for defendants, plaintiff appeals. Reversed and remanded, with directions.

F. H. Peterson, of Moorhead, Minn., for appellant.

Alfred Jaques, U. S. Atty., of Duluth, Minn., for the United States.

R. J. Powell, of Minneapolis, Minn., and Clayton C. Cooper, of Mahnomen, Minn., for appellee Mooers.

⬤For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Before HOOK and SMITH, Circuit Judges, and AMIDON, District Judge.

SMITH, Circuit Judge. On August 15, 1894 (28 Stat. 286, 305, c. 290, § 1), and on February 6, 1901 (31 Stat. 760, c. 217, § 1 [Comp. St. 1916, § 4214]), Congress enacted:

"That all persons who are in whole or in part of Indian blood or descent who are entitled to an allotment of land under any law of Congress, or who claim to be so entitled to land under any allotment act or under any grant made by Congress, or who claim to have been unlawfully denied or excluded from any allotment or any parcel of land to which they claim to be lawfully entitled by virtue of any act of Congress, may commence and prosecute or defend any action, suit, or proceeding in relation to their right thereto in the proper Circuit Court of the United States; and said Circuit Courts are hereby given jurisdiction to try and determine any action, suit, or proceeding arising within their respective jurisdictions involving the right of any person, in whole or in part of Indian blood or descent, to any allotment of land under any law or treaty."

This action was brought under that statute.

The plaintiff on March 15, 1889, moved to the Chippewa reservation at White Earth, Minn., and took up her home at the town of White Earth in a house erected by her husband, and there remained until about 1902 or 1903. Her husband moved back to Minneapolis and died there, but she remained on the White Earth reservation. In 1903 she moved to the west half of the northeast quarter, and the southeast quarter of the northwest quarter, and the south half of the north half of government lot 3 in section 2, township 146, range 40 west of the fifth principal meridian. She there made improvements, consisting of a house and two barns, which have been burned down, built a barbed wire fence, and grubbed the timber and brush from about 1½ acres of land. Her improvements were worth about $800. She has remained on these lands ever since. About 1909 the said lands were allotted to one Pah-dub, and were subsequently patented to him and sold to the defendant S. E. Mooers. The plaintiff is now 88 years old, and was 85 at the time of the trial.

Bearing in mind her life and attainments, it is manifest that as to the proof of her pedigree and family history the rule as to hearsay has been greatly relaxed. Jones on Evidence, §§ 312 to 318; chapter 43, Chamberlayne on the Modern Law of Evidence, p. 4037; Greenleaf on Evidence (16th Ed.) vol. 1, pp. 197–203; Abbott's Trial Evidence (1st Ed.) p. 90 et seq.; Rice on Evidence (1st Ed.) pp. 413–419; 10 Ruling Case Law, 963–966; 16 Cyc. 1223–1235.

The case has under a special order of the court been submitted on a typewritten transcript. It is difficult to determine the exact facts. The transcript is filled with typographical errors. Many mistakes have been made in the examination of the witnesses. For example, one of the questions refers to Commissioner Fletcher whereas it is quite manifest it was meant to refer to Congressman Fletcher; but greater difficulties than these are found in the transcript. Plaintiff does not speak the English language and testified through an interpreter. Many of the witnesses are in part of Indian blood, and their English is not of that clearness which could be desired; but, bearing the rules in the authori-

ties cited in mind, we have no doubt the evidence shows the plaintiff was born on the Red river, in Canada, near Ft. Garry or Winnipeg, to Michael Delaney and his wife, Isabel Delaney; her mother, Isabel Delaney, was born about the first of the nineteenth century at Fond du Lac, Minn.; Mrs. Delaney's maiden name was Isabel Bazille; the maiden name of the plaintiff's grandmother, the mother of Mrs. Delaney, was Therease Cotte; she was married to a full-blood Indian named Kah-we-tah-wah-mo, a member of the Fond du Lac band of the Chippewas of Lake Superior. See 10 Stat. 1109, 1110, subd. 4, art. 2. For aught that appears he and his wife were always fully recognized as members of that band and tribe. It seems probable that Mrs. Bazille had Indian blood as well as her husband. She looked like an Indian woman; she had black hair, which she wore down her back, wore moccasins, and, besides doing her domestic duties, did a great amount of bead work and was an Indian doctor. They lived in a tepee. Mrs. Bazille died at Fond du Lac. Their daughter, Isabel, was at the age of 14 married to Michael Delaney, a Canadian Frenchman, who was by occupation a mason. Mrs. Delaney was one-half to three-fourths Chippewa of Minnesota. She wore her hair down her back, made moccasins for sale, did bead work and sold the same, and like her mother, aside from domestic duties, was an Indian doctor and midwife; she walked pigeon-toed, as most Indian women do; she frequently went from Fond du Lac to the Red river to make maple sugar before and after her marriage; she lived in a tepee. Shortly after her marriage, there being substantially no work in Mr. Delaney's line in Fond du Lac, they went up on the Red river in Canada near Ft. Garry or Winnipeg, and he worked there on the fort and made some tombstones. When they started from Fond du Lac to Red river, they first traveled with a dog team, and when they came to the river they crossed it in bark canoes, and then carried the canoes to the next lake until they got through. Eight children were born to them while they were living in Canada; the plaintiff being probably the third. She was born about 1828 or 1829. When plaintiff was about 19 her father moved back, about 1850, to Minnesota and secured work on Ft. Snelling. Two years later his wife joined him and there bore him two more children. Plaintiff remained about two years longer with her aunt, until her parents were settled at St. Paul, and then by their direction she joined them and remained with them a couple of years, when she was married to Joseph Vezina, a Canadian Frenchman, a carpenter, millwright, railroad bridge builder, and farmer, and they moved to Mendota, and later to Minneapolis. In the meantime, and about ten years after they had settled at St. Paul, the Delaneys moved to Rice Lake, about 18 miles from St. Paul, and to a farm. There they remained several years, when they moved to Minneapolis, where Mr. Delaney died, and his wife followed him about 1875. She also looked like an Indian squaw; she wore no stockings, but in winter wore cloths wrapped about her legs to protect her from the inclemency of the weather. While the plaintiff and her family were living at Mendota, her mother received an allotment of goods from the government, consisting of blankets, gingham, and calico, which she divided with the plaintiff. One witness says Mrs. Delaney

was about three-fourths Indian by blood, more like a full-blood than three-fourths, and she acted like a squaw. At one time Mrs. Delaney showed Louis Hamlin what she claimed was some scrip issued to her by the government. Nearly all of Mrs. Delaney's and the plaintiff's brothers and sisters married Indians or mixed-bloods. In her youth Mrs. Delaney frequently went out with others on buffalo hunts, carrying a pack on her back; she smoked a red clay pipe. Through their lives, and in the various places where they have lived, Mr. and Mrs. Delaney and Mr. and Mrs. Vezina lived the greater portion of the time since they quit the tepee stage in log cabins.

Prior to October, 1863, there was issued to the plaintiff, under the seventh clause of the second article of the treaty of September 30, 1854 (10 Stat. 1109), as a mixed-blood Chippewa of Lake Superior, scrip for 80 acres of land, certificate No. 119. This scrip was located in October, 1863, on land in the Stockton land district in California by William S. Chapman, attorney in fact. A patent was issued on this land, but on May 8, 1879, the same was canceled. A careful reading of subdivision 7 of article 2 of the treaty (10 Stat. 1109) will show it did not contemplate the issuance of scrip at all. There was issued, however, to 278 persons what was known as "Gilbert scrip." On March 19, 1872, the Secretary of the Interior ruled that:

"All the so-called scrip issued under this treaty, except such as is denominated the 'Gilbert scrip,' is so tainted, by the actual and clearly established frauds practiced in issuing it under the construction before referred to, as, in my opinion to deprive these certificates of any value or validity, even for the purpose of determining the identity of the persons entitled to the benefits of the treaty. Therefore, besides reversing the construction of the treaty under the decision of Secretary Usher as aforesaid, I have to direct that all the so-called 'scrip' forming the subject of your report and that of the commissioners before referred to, except the 'Gilbert scrip,' be declared illegal, fraudulent, and void, and all entries of land made with such scrip and unpatented should be canceled."

While certificate No. 119 was declared illegal and void, there is no finding that plaintiff was personally guilty of any fraud; but it clearly appears that as early as 1863 the plaintiff claimed to be a mixed-blood of the Chippewas of Lake Superior, and, although it had no right to issue any scrip upon such a claim, the government recognized the truth of her claim that she was a mixed-blood Chippewa of Lake Superior, and in declaring the scrip void did not declare otherwise. Mrs. Delaney talked Chippewa and broken French, while Mrs. Vezina talked French and broken Chippewa.

On January 14, 1889, Congress passed "An act for the relief and civilization of the Chippewa Indians in the state of Minnesota." 25 Stat. 642, c. 24. This act provided for the appointment by the President of three commissioners to negotiate with all the different bands and tribes of Chippewa Indians in the state of Minnesota for the relinquishment of all their interest in the state, except in the White Earth and Red Lake reservations. Section 3 of this act provides that after the compliance with certain specified terms all of the Chippewa Indians of Minnesota, except those in the Red Lake reservation, be removed to and take up their residence on the White Earth reservation and that they should be allotted lands in severalty in conformity with

Act Feb. 8, 1887, c. 119, 24 Stat. 388. The act (25 Stat. 642), in its first section, provides that, for the purpose of making the allotments and for other purposes, the commissioners should make a census of the Indians. The President appointed under the act the following persons, who served as commissioners for the time indicated: Hon. Henry M. Rice, February 26, 1889, to May 29, 1891. Bishop Martin Marty, February 26, 1889, to June 22, 1893. Hon. Joseph B. Whiting, February 26, 1889, to January 10, 1891. Hon. Darwin S. Hall, May 29, 1891, to April 15, 1893. Hon. Francis Campbell, January 10, 1891, to April 22, 1892. Hon. Rockwell J. Flint, April 22, 1892, to September 22, 1893. Hon. William M. Campbell, April 15, 1893, to November 30, 1894. Hon. Benjamin D. Williams, June 22, 1893, to June 10, 1896. Hon. J. Montgomery Smith, September 22, 1893, to June 10, 1896. Hon. Melvin R. Baldwin, February 15, 1895, to July 28, 1897. Hon. Darwin S. Hall, July 28, 1897, to December 31, 1899.

On November 21, 1889, the commissioners, then consisting of Hon. Henry M. Rice, Bishop Martin Marty, and Hon. Joseph B. Whiting, and 123 adult Indians of the Fond du Lac band of Chippewas of Minnesota, by agreement ratified the act of January 14, 1889 (25 Stat. 642), and the Indians ceded to the United States all of their former reservation in Minnesota. As already stated, between the passage of this act of Congress and the making of this treaty or agreement, the plaintiff, on March 15, 1889, moved to the White Earth reservation, and she has lived there ever since, more than 25 years at the time of the trial of this cause in the District Court, and now more than 28 years.

The law did not call for the consent of the Indians to the making of the list for allotment. That power was solely vested in the commissioners, but they wisely in the main decided to take the advice of an Indian council, not with the old White Earth Indians, but of the new and old occupants of that reservation. There was considerably more land in the reservation than was required for allotment. The act (25 Stat. 642) provided for the sale at public auction of the pine lands of the reservation, at not less than their appraised value, and the entry of the agricultural lands under the homestead law, but required each homesteader to pay $1.25 per acre for his land. The act further provided that the proceeds of the sale of pine lands and agricultural lands should all be to the ultimate benefit of the Chippewas of Minnesota. Thus every member of the council acquired a direct personal interest adverse to any claimant to an allotment in the loss which would result to the residue if allotments were allowed which would reduce the lands which belonged under the act to the Indians in common. The Indians were much divided as to Mrs. Vezina's claim to be listed with the commissioners and to giving her an allotment. White Cloud, the principal chief, after making personal investigation, was in her favor, as were many more of the Indians, and the proceedings of the first council, if ever recorded, are not in evidence. Suffice it to say they never voted to recommend that Mrs. Vezina be put upon the list. The council of June 1, 1907, rejected her, and in later years the council constantly referred the matter back to the government. After liv-

ing at the town of White Earth on the reservation, in a house which they had been expressly permitted to build by the chief, and apparently at least with the acquiescence of the Indian agent and commissioners, for 13 years or more, she moved to the land in question about the time of her husband's death. The description of the land upon which she located was furnished her by Joseph Perrault, who was employed at the government agency.

On September 2, 1892, Chairman Hall of the commission, and on June 20, 1894, Chairman Campbell of the commission, reported adversely on Mrs. Vezina's claim, and these decisions were sustained by the Indian Office. On May 27, 1895, Chairman Melvin R. Baldwin of the commission reported he believed the plaintiff's mother was a member of the Chippewa tribe, and that the chiefs and head men of the Mississippi band had petitioned for the enrollment of plaintiff, and recommended that she be enrolled and allowed all the rights and privileges granted the Chippewas of Minnesota under the act of January 14, 1889. On June 8, 1895, the Acting Commissioner of Indian Affairs overruled the chairman of the commission in this regard.

Without stopping to discuss whether under the act of Congress in question he had any such power, at about this same time, but possibly before the action of the department, Mr. Baldwin told the plaintiff to go back to her land and she would never be molested. On December 21, 1898, the plaintiff having made application under clause 2 of the second article of 10 Stat. 1109, the Commissioner of Indian Affairs submitted the claim to the Secretary of the Interior, who disallowed her claim upon the ground of an absence of evidence, rather than upon a finding adverse to her upon affirmative evidence. On January 27, 1899, the Assistant Commissioner of Indian Affairs wrote Hon. Darwin S. Hall, who was, it will be remembered, a member of the commission from May 29, 1891, to April 15, 1893, and from July 28, 1897, to December 31, 1899, and who was at the time in question chairman of the Chippewa Commission. In this letter it was recited:

"As you are aware, Mrs. Vezina's claim for enrollment and for an allotment under the act of January 14, 1889, has three times been investigated by the Chippewa Commission and as a result of these investigations the commission has each held that Mrs. Vezina was not entitled to enrollment. In this conclusion the office concurred each time."

The letter further recited that Congressman Loren Fletcher had written the Indian Office about the matter and it had been decided to consider his letter as an appeal. It will be observed that this letter stated that the commission had each of three times held that Mrs. Vezina was not entitled to an enrollment. It will be remembered that this is an inaccurate statement. It is true the commission had twice so reported, but the last report had been favorable to her claim and been overruled by the Indian Office. On March 24, 1900, upon an application for a rehearing all the papers in the case were referred to Commissioner Hall, who, it will be recalled, had made the first investigation in which a report was made adverse to her claim. On July 18, 1900, Commissioner Hall made a report, reversing the former one and recommending that Mrs. Vezina be enrolled. His new report was

overruled by the Indian Office and the Acting Secretary of the Interior. On June 20, 1903, Simon Michelet, United States Indian agent at the White Earth reservation, gave a certificate that he was satisfied that Mrs. Vezina was entitled to locate lands under the seventh clause of the treaty of September 30, 1854. On May 6, 1904, the office of Indian Affairs wrote to Mr. Michelet that the claim of the Vezinas had been several times passed upon, and it had been determined that they were not entitled to enrollment, and that "no countenance or sanction whatever must be given to their pretended claim or right to occupy lands on the White Earth reservation." In October, 1907, the Acting Commissioner of Indian Affairs wrote to the superintendent in charge of the White Earth agency that a petition for rehearing had been filed in the Vezina matter through the President, and added:

"In view of the facts stated in the petition, that these people have actually resided on the lands they are claiming as allotments for 17 years, and have added much value to them by cultivation and improvements, the office feels disposed to again let their cases be presented to a general council of the White Earth Indians. The papers are accordingly sent to you herewith. You are instructed to present the Vezina cases to the next general council of the White Earth Indians. You are requested at your earliest convenience to notify Mrs. Vezina and the members of her family (not including grandchildren) who have made actual settlement in the White Earth reservation of the action taken, and warn them that they should be prepared to properly present their case to the next general council. You are instructed further that you should seasonably notify the Vezinas of the date when the council will convene. As far as practicable you should co-operate with these claimants in a proper presentation of their case to the council when it convenes. These instructions do not mean that a special council shall be called to hear these cases, but simply that they should be presented at the next general council that is convened."

On January 20, 1908, the Acting Commissioner of Indian Affairs wrote to the superintendent in charge of the White Earth agency:

"I send you herewith, for proper action, a letter from Mrs. Elizabeth Vezina and family, dated Langby, Minn., January 8, in relation to the enrollment of herself and children with a view to procuring allotments under the provisions of the act of Congress of January 14, 1889 (25 Stat. 642). The case is an old one, as you know; considerable correspondence having passed between the Chippewa Commission and the office and your agency and the office in relation thereto. With your letter of July 12, 1907, you transmitted to the office a certified copy of the proceedings of a general council of the White Earth Band of Chippewa Indians held on June 1, 1907, to take action on matters of general interest to the tribe, and to pass on the rights of applicants for enrollment, etc. Included in the list were the applications of the Vezina family, which had been rejected by the council. The Acting Secretary of the Interior approved the action of the council, and you were so advised on August 22. It appears that these people have lived on the reservation for 18 years. It is assumed that they are now in possession of the lands originally chosen as their allotments. After all these years of residence on and improvement of the lands selected, it would be a great calamity to them to have to surrender the lands. Mrs. Vezina is now 79 years of age and getting quite feeble. The office feels much sympathy for her, and believes she and her children— but not her grandchildren—should be enrolled and allotted the lands they have so long occupied. You are therefore requested to present the application of Mrs. Vezina and her family for enrollment for the action of the next general council of the White Earth Indians, and urge favorable action thereon."

245 F.—27

On January 28, 1908, Simon Michelet, superintendent of the White Earth agency wrote the Commissioner of Indian Affairs as follows:

"In reply to office letter of January 20, 1908, marked 'Land Office 2562–1908, File 053,' subject 'Relative to enrollment of Mrs. Elizabeth Vezina and family,' in which you inclose a letter from Mrs. Vezina to the President of the United States, I have the honor to report that I called a general council of all of the Indians of the White Earth reservation, to be held at White Earth agency on December 28, 1907, for the purpose of passing upon applicants for enrollment, of which I had a number on file awaiting a hearing at the general council. I stated in the notice that the council was called for the purpose of passing on applicants for enrollment. In order that you may know how the Indians feel regarding enrollment, I will say that no one attended this council, or appeared, except one or two chiefs. These two present agreed to call a council a few days later; these two chiefs notified all of the other chiefs and head men who generally attended the councils to be present but they failed to put in an appearance at the second called council. On Saturday, January 11, 1908, the Indians held a council at White Earth, and when I learned of it I sent word to the council that I desired to present a number of applications for enrollment. I was advised that they did not care to take up any of these applications and I have to state frankly that I do not believe that this old woman (Mrs. Vezina) should receive any encouragement whatever, if you intend to leave this matter to the council. They are so prejudiced and biased in acting upon these applications that it is simply impossible for any of these applicants to receive a fair hearing in regard to enrollment. It seems to me that your office has treated the Indians with courtesy when opportunity is granted for them to pass upon these applications, but when the Indians, in council, refuse to act, it seems to me that the obligation to treat with them further upon the subject ceases. I am fully satisfied that this old woman has rights on this reservation; there is no doubt about her Indian blood, and it is my humble opinion that she is entitled to enrollment, whether the Indians consent to her enrollment or not. It seems to me that it would be a good lesson to the Indians to enroll this woman, when they refuse to give her case the consideration it should have."

On December 1, 1908, John R. Howard, United States Indian agent, wrote to the Commissioner of Indian Affairs as follows:

"I have the honor to submit the minutes of a general council of the tribes of Indians belonging to the White Earth reservation, held, pursuant to call on October 1st and 2d for the purpose of acting upon the applications of various persons for enrollment on the tribal rolls, and for transacting any other business that might lawfully come before it. A number of applications were placed before the council and acted upon as follows: * * * Case No. 10. Elizabeth Vezina, This application has been rejected by a former council. The applicant and members of her family were all present with her attorney, but notwithstanding the order contained in your office letter of October 25, 1907 (Land 75, 755–1907), directing me to submit the matter to another council, and which letter was before them, the council absolutely refused to permit the matter to be brought before them. I understand that this matter is now definitely settled, so far as this office is concerned."

December 30, 1908, the Commissioner of Indian Affairs wrote the Secretary of the Interior as follows:

"This office is in receipt of a letter from John B. Howard, United States Indian agent, White Earth agency, dated December 1, 1908, submitting the minutes of a general council of the White Earth Chippewas of October 1 and 2, 1908. The council was called to consider the matter of the applications of various persons for enrollment as members of the tribe, with a view to procuring annuities and allotments under the provisions of the act of Congress of January 14, 1889 (25 Stat. 642), and the act of April 28, 1904 (33 Stat. 539, c. 1786). * * * The cases not receiving the sanction of the council are as follows: * * * Elizabeth Vezina and family. * * * In each of the

above cases, from 8 to 12, inclusive, the agent recommended that the action of the council in rejecting the application, or applications, be approved. This recommendation is concurred in by the office. The action of the council in each of the cases referred to above, from 1 to 7, inclusive, seems to be justified by the facts developed by the evidence. It is thought, also, that the council was entirely justified in taking unfavorable action on each of the cases from 8 to 12, inclusive."

October 28, 1909, the Acting Commissioner of Indian Affairs wrote to Henry Vezina, son of plaintiff:

"Referring further to your letter of June 24, 1909, regarding the application of Mrs. Elizabeth Vezina for rights with the Indians of the White Earth reservation, you are informed that the superintendent of the White Earth reservation, in accordance with the request of this office, has made a further investigation with regard to the matter. In the report which has been submitted to the office, no additional evidence is submitted that would in any way modify or change the attitude of the department and the office with regard to the application of the members of the Vezina family for enrollment with the White Earth Bands of Chippewa Indians. The office would not be justified in recommending to the Secretary of the Interior that the case be reopened. In this connection your attention is called to the act of Congress of February 6, 1901 (31 Stat. 760), which provides: [Here follows a transcript of the statute in question under which this suit was brought, and the letter proceeds:] It appears to the office that this would be the simplest and most direct way of having the rights of your family determined to the White Earth reservation, and no objection would be interposed to a determination of your rights in the manner provided by this law. Members of your family have resided on the reservation for more than 18 years and the White Earth bands of Chippewa Indians claim that you should be excluded from the reservation, because you have not been enrolled with the tribe and therefore have no rights on the reservation. The question of the removal of the members of your family from the reservation has been considered several times, and unless your rights are determined without further delay it may be necessary to take such action in the near future. It is hoped, therefore, that this course will not be necessary, when there is ample opportunity for a determination of your rights in the manner indicated by the act of February 6, 1901, above cited."

On December 13, 1911, there was filed in the office of Indian Affairs the affidavit of Margaret Roy, '93 years old, a cousin of plaintiff, swearing that from common report in the family plaintiff was a mixed-blood Indian belonging to the Mississippi band of Chippewas of Minnesota and a granddaughter of Kah-we-tah-wah-mo, who was a full-blood member of said tribe.

[1] We are clearly of the opinion that the plaintiff is by blood a member of the Fond du Lac band of the Chippewas of Lake Superior. The evidence shows a considerable number of persons born off the reservation, and who reached middle life before the treaty of January 14, 1889, and who then moved to the reservation, were recognized, enrolled, and secured allotments upon the reservation. Two out of three of the commission reports were finally in her favor, and the Indian Office on January 20, 1908, urged favorable action upon her case. Simon Michelet, the Indian agent, reported in her favor.

[2] But it is contended that she and her mother abandoned their membership in the tribe. This is not specially pleaded by either of the defendants; but, even if it were pleaded, we have reached the conclusion that it is not sustained. The act of the Fifty-Fifth Congress (Act June 7, 1897, c. 3, 30 Stats. 62, 90 [Comp. St. 1916, § 4106) provides:

"That all children born of a marriage heretofore solemnized between a white man and an Indian woman by blood and not by adoption, where said Indian woman is at this time, or was at the time of her death, recognized by the tribe shall have the same rights and privileges to the property of the tribe to which the mother belongs, or belonged at the time of her death, by blood, as any other member of the tribe, and no prior act of Congress shall be construed as to debar such child of such right."

Mrs. Delaney was up to at least her marriage fully recognized as a member of the Fond du Lac band of the Chippewas of Lake Superior and there is nothing to indicate that she ceased to be so recognized up to the time of her death. Under this statute Mrs. Vezina is clearly entitled to be recognized and treated in all respects as if she had remained upon the reservation. It is true that, if Mrs. Delaney was now living, under our decision in Oakes v. United States, 97 C. C. A. 139, 172 Fed. 305, Mrs. Vezina would not be entitled to be enrolled under this statute. That decision would probably exclude the children of Mrs. Vezina from the right to enrollment and from allotment. As there is no case before us now, except the case of Mrs. Vezina, we do not care to express a more definite opinion upon the question of her children. The Oakes Case, in place of being in favor of the defendants, is, in our view, directly against them. It is true that the Oakes Case held, and many statutes of the United States prior thereto recognized, that Indian citizenship could be abandoned; but it should be borne in mind that the inference of such abandonment should not be drawn from light and trifling circumstances. The Indians were a nomadic people, and a member temporarily absent from the reservation would not forfeit the right of an Indian as a member of the tribe. In the absence of a treaty or an act of Congress, Indians were not citizens of the United States; and, even though one has abandoned his tribe, and taken up his abode among the white race, and recognized no authority over him except that of the United States and the state wherein he resides, he is not, and cannot become, a citizen of the United States, in the absence of a statute or treaty to that effect. Elk v. Wilkins, 112 U. S. 94, 5 Sup. Ct. 41, 28 L. Ed. 643; Famous Smith v. United States, 151 U. S. 50, 14 Sup. Ct. 234, 38 L. Ed. 67.

The court should not find upon light and trifling circumstances that an Indian has forfeited his citizenship in his tribe and in no method acquired any other citizenship, but has become literally a man without a country. It should take especially strong evidence that an Indian woman has abandoned her tribe simply by living with her husband, which she ought to do by the laws of both God and man.

It is ordered that the decree of the District Court be reversed, and the cause remanded, with directions to enter a decree in harmony with this opinion in favor of the plaintiff.