## HARDY–BURLINGHAM MINING CO. v. BAKER.

(Circuit Court of Appeals, Sixth Circuit. February 5, 1926.)

No. 4300.

**1. Trial ☞139(1)—Scintilla of proof does not justify submission to jury.**

In federal courts, a mere scintilla of proof does not justify submission of issue to the jury, but proof must have appreciable and reasonable substance.

**2. Evidence ☞14, 571(9)—Common knowledge that "nervous wreck" cases develop without known physical cause, and claim must be based on definite and competent expert proof.**

It is common knowledge that many of the cases of "nervous wreck" develop without any known specific physical cause; hence a claim that such result followed known and specific physical or functional upset must have definite and competent expert proof, which shall at least show fair and reasonable probability of cause and effect relation.

**3. Appeal and error ☞926(7)—Circuit Court of Appeals will assume physician sufficiently qualified as expert, where no objection was made.**

Circuit Court of Appeals will assume that a physician was sufficiently qualified as an expert, where no objection was made, although the mere fact that he was practicing as physician might not be enough.

**4. Evidence ☞555—Opinion based on subjective symptoms stated to doctor to qualify him to testify cannot be received.**

Expert opinion of doctor based in material part on statements by plaintiff of the subjective symptoms from exposure up to time of statement, for the purpose of qualifying doctor to testify, cannot be received.

**5. Evidence ☞555—Opinion based on subjective symptoms stated to physician to get treatment and cure are admissible.**

Opinion of physician, based on subjective symptoms stated to him to get treatment and cure would be admissible in evidence.

**6. Damages ☞208(2)—Doctor's testimony presenting no professional reasons for conclusion held to constitute only scintilla of proof, not justifying submission to jury of question whether plaintiff's condition of health was caused by injury.**

Where doctor's testimony as to injury to mine employé being caused by inhalation of poisonous gases, was not supported by professional reasons for conclusion, nor theory as to how or why results could follow, *held* that his testimony constituted at best only that scintilla of proof not justifying submission to jury of question whether plaintiff's condition of health was caused by his inhalation of mine gas.

In Error to the District Court of the United States for the Eastern District of Kentucky; Andrew M. J. Cochran, Judge.

Action by R. H. Baker against the Hardy-Burlingham Mining Company. Judgment for plaintiff and defendant brings error. Reversed and remanded for new trial.

Frank V. Benton, of Newport, Ky., and B. R. Jouett, of Winchester, Ky., for plaintiff in error.

O. H. Pollard, of Jackson, Ky. (T. T. Cope, of Jackson, Ky., and C. S. Landrum, of Lexington, Ky., on the brief), for defendant in error.

Before DENISON, DONAHUE, and MOORMAN, Circuit Judges.

DENISON, Circuit Judge. In the court below Baker recovered against the Mining Company a judgment based on a personal injury. At the time of the trial he appeared to be, and, giving due effect to the verdict, it must be assumed that he in truth was in the condition which is concisely indicated by the term "nervous wreck." He charged this result to his experience in the first half hour of the first and only day that he worked in the defendant's coal mine. It is his theory that he then inhaled a "poisonous gas," which defendant was negligently permitting to exist at the place where he was put to work, and that his final condition was the proximate result of this negligence.

The only question for review is whether there was in the evidence the necessary legal basis to support each of the three conclusions: (1) That plaintiff did inhale gas at this time and place; (2) that its presence implied defendant's negligence, and (3) that there was due causal relation between this inhalation and his later serious illness. We pass by, as needing no separate consideration, the fourth question, whether he was at and before the trial really sick, or only malingering.

[1] Appellate courts are constantly deciding whether, in a given case, there was or was not "substantial evidence" to a given effect. Usually it is enough to decide this concrete question, and no more. Occasionally it is worth while for a court to review the fundamental definition, and recall how it has been

discussed and fixed by the decisions controlling that court. This seems an appropriate occasion for some consideration of this kind, because the proper application to this record of the "substantial evidence" test depends upon some precision of understanding as to what the test is.

The rule prevailing in some jurisdictions that any evidence having any legal tendency to prove the point, is enough to require the court to submit that point to the jury was, 50 years ago, denied by the Supreme Court in Commissioners v. Clark, 94 U. S. 278, 284, 24 L. Ed. 59, where the "scintilla" rule is expressly disapproved. That court has at different times defined the degree of proof involved as: That from which the jury might "justifiably find" a verdict, or "come fairly and reasonably to the conclusion" (Pleasants v. Fant, 22 Wall. [89 U. S.] 116, 122, 22 L. Ed. 780); that upon which the jury can "properly proceed" (Commissioners v. Clark, supra); "evidence that would justify" (Carter v. Corusi, 5 S. Ct. 281, 285, 112 U. S. 478, 484 [28 L. Ed. 820]); that from which the conclusion "can be reasonably and legitimately inferred" (Randall v. B. & O. R. R. Co., 3 S. Ct. 322, 323, 109 U. S. 478, 482 [27 L. Ed. 1003]); that from which "a reasonable inference can be drawn" (Smith v. U. S., 14 S. Ct. 234, 235, 151 U. S. 50, 55 [38 L. Ed. 67]); "some evidence, * * * but so meager as not in law to justify a verdict" (Sparf v. U. S., 15 S. Ct. 273, 292, 156 U. S. 51, 100 [39 L. Ed. 343]); "is of such a conclusive character that the court * * * can be compelled to set aside a verdict to the contrary" (Patton v. T. & P. Ry., 21 S. Ct. 275, 276, 179 U. S. 658, 659 [45 L. Ed. 361]).

This court has often attempted the definition or explanation. The precise point is best illustrated by the difference between the legal duty not to submit and the discretionary duty to grant a new trial. Though the Supreme Court had several times used language which seemed to ignore any such distinction, Judge Lurton, in Mt. Adams Co. v. Lowery (C. C. A. 6) 74 F. 463, 20 C. C. A. 596, in a thorough opinion, develops the difference. He quotes with approval:

"A scintilla of evidence, or a mere surmise that there may have been negligence on the part of the defendants, clearly would not justify the judge in leaving the case to the jury. There must be evidence upon which they might reasonably and properly conclude that there was negligence. * * * Applying the maxim, 'De minimis non curat lex,' when we say that there is no evidence to go to the jury we do not mean that there is literally none, but that there is none which ought reasonably to satisfy a jury that the fact to be proved is established."

Many English and federal cases are reviewed, and he concludes:

"If evidence be of so slight a character as to come within a reasonable definition of the scintilla rule, it is the duty of the court to direct a verdict, or, if it has submitted the matter to the jury, to set aside a verdict having no other support than a mere scintilla. In all such cases the evidence is insufficient in law."

There is, further (page 475), recognition of the rule that "evidence may be so insufficient in fact as to be insufficient in law." The further conclusion is that there may be such insufficiency in fact in plaintiff's evidence as to make it clear that the verdict for plaintiff ought to be set aside and yet not such insufficiency in law as to justify refusing to submit. In Felton v. Spiro (C. C. A. 6) 78 F. 576, 24 C. C. A. 321, the same rule is again applied in an opinion by Judge Taft; and again by Justice Harlan for this court in Travelers' Co. v. Randolph, 78 F. 754, 759, 24 C. C. A. 305; he suggests another formula for the power to direct, "when the evidence is so distinctly all one way that a different view of it would shock the judicial mind"; and again the subject was discussed for this court by Judge Severens in Minahan v. Grand Trunk Ry., 138 F. 37, 70 C. C. A. 463. He said:

"Undoubtedly, it is distinctly settled that a mere scintilla, a spark, which arrests attention, and then from mere lack of vitality fades away, is not sufficient to warrant the submission of an issue of fact to a jury, when the scintilla is all that is developed by the party having the burden of proof. Such a showing has no substance, has not the quality of proof, and the judge may lawfully say so to the jury. And it must be admitted that the Supreme Court has gone a step farther than this, and assigned to the province of the court the right to direct the jury in those cases standing between those where there is a mere scintilla and those where there is substantial evidence, standing in a borderland, so to speak, where the evidence is so vague, indefinite, or inconsequential as not to furnish a reasonable foundation on which a verdict could rest. * * *

"In other cases it is said the condition contemplated in which the judge may direct the verdict is when, 'in his deliberate opinion,

there is no excuse for a verdict save in favor of one party.' * * * And by 'evidence' we mean something of substance and relevant consequence, and not vague, uncertain, or irrelevant matter not carrying the quality of 'proof' or having fitness to induce conviction."

In Jenkins Co. v. Alpena Co. (C. C. A. 6) 147 F. 641, 77 C. C. A. 625, Judge Cochran, speaking also for Judges Lurton and Severens, varies the form of the rule by saying:

"What constitutes such evidence may be indicated in another way. If the evidence favoring such facts of the plaintiff's case is such that reasonable men may fairly differ as to whether it establishes them, then it is substantial. If, however, it is such that all reasonable men must conclude that it does not establish them, then it is not substantial."

In Virginia Co. v. Hawk, 160 F. 348, 87 C. C. A. 300, this court said, again by Judge Cochran, and in language applicable in large degree to the case at bar:

"But a case should never be left to a jury simply on a question of probabilities, with a direction to find in accordance with the greater probability. Probabilities may help out items of evidence from which an inference can be drawn, but cannot take their place. To allow a jury to dispose of a case simply upon a weighing of probabilities is to turn them loose into the field of conjecture, and to have the rights of the parties determined by guess." Then there is an apparent approval of the Maine holding that a merely "quantitative probability" is not sufficient to support a verdict.

Richards v. Mulford (C. C. A. 6) 236 F. 677, 679, 680, 681, 150 C. C. A. 9, furnishes a fairly pertinent illustration. There was doubtless some evidence tending to show that the infection might have arisen in the way claimed; but, checking that possible inference against the whole situation, not even a quantitative probability remained. See also cases there cited, and Copeland v. Hines (C. C. A. 6) 269 F. 361, in which it is said (page 363): "A mere conjecture, standing upon a basis of uncertain inference, does not make substantial evidence. Such a case lacks both the quantitative and the qualitative essential minimum."[1]

[1] We have purposely omitted from consideration most of those cases where the question is as to the conduct of the suppositious "reasonably prudent man." Juries have so much common knowledge of that standard that only in the clearest cases can a court say there is no room for two inferences.

Coming to the facts of this case: We are convinced that there was evidence sufficient to support findings that there was gas in the mine at the time and place where plaintiff was put to work, that defendant should have known it, and that there was negligence in permitting it then to have been there, as well as that plaintiff's immediate nausea and headache came from this gas. It may well be that upon this printed record the weight of the evidence on each of these questions is very strongly against the plaintiff; upon that we intend to express no opinion, because that is a jury question. Some conceded facts that seem inconsistent with these inferences may perhaps be explained by assuming that plaintiff was more susceptible than the experienced miners and would be affected by conditions which they did not even notice; but all matters of this kind were for the jury.

The question whether there is any room to attribute his later serious condition to this experience requires a more detailed statement. There is nothing tending to show that this gas could have been anything other than one of the two which more or less frequently do exist in Kentucky coal mines—carbon monoxide and carbon dioxide. Each is the product of an incomplete and unbalanced combustion resulting from fire in the mine. The only fire which this record suggests is that incidental to powder or dynamite explosions in blowing down coal. The after-effect of these explosions is commonly carbon dioxide. If it may be assumed that sometimes carbon monoxide is produced, that does not seem now important, because the effects of the two gases resulting from human inhalations seem to be the same except in degree. The monoxide produces more dangerous results with the same time exposure, or equal results with less time exposure.

Plaintiff's testimony was that he was in perfect health when he went to work that morning drilling holes, that he soon began to feel faint, had a headache, and became nauseated and felt his face burn; that his faintness increased until he complained to the foreman; that the foreman directed him to go out into the main air passage, where the foreman observed and exclaimed upon the condition of plaintiff's face, which was broken out into a rash and pimples; that the foreman directed plaintiff to lie down in this air passage; that the plaintiff did so, and soon felt better; that he continued in the mine the remainder of the day, and ate his lunch and worked as a carpenter at timbering, as direct-

ed by defendant, until the end of the workday at 4 o'clock, although he was continuously more or less nauseated and weak; that, his bad feelings and his face eruption continuing, on the next day he consulted the mine doctor, who gave him some skin application and made light of his bad feelings, and that these continued to increase, leading along into great nervousness and partial paralysis, culminating in the "nervous wreck" condition; that after that day he was never able to do any work but constantly grew worse.

[2] It is quite obvious that such a situation presents a peculiar problem of cause and effect. In the ordinary run of affairs, all men have some knowledge as to the natural effects or the probable causes of certain conditions. Such matters do not depend, save as to their extent and refinements, upon expert knowledge and opinion, and all of us may reason intelligently thereon, to a certain point. Upon other subjects this is not true, as, for example, with regard to any chemical reactions beyond those most common and familiar. It is especially not true with diseases of the nerves, or with abnormalities in physiological functions. It is common knowledge that with the latter, and even more with the former, the real cause of the trouble is frequently most obscure. Very often only the most expert diagnosticians can intelligently judge what the cause was, and frequently they can only say what it may have been. It is, we think, common knowledge—if not, this record may supply it—that a great share, perhaps most, of the cases of "nervous wreck" develop without any known specific physical cause. When, therefore, a claim that such a result followed from a known and specific physical or functional upset comes before a court as a basis for demanding compensation therefor, there must, in aid of common knowledge, be some definite and competent expert proof, which shall at least show a fair and reasonable probability of the cause and effect relation. Of course, if it thus appears that the alleged cause may have produced the actual result, and there is nothing to show any other explanation equally probable, the proof may be sufficient. Each such case must stand on its own record.

The testimony, both from those with practical experience as miners and with expert knowledge and experience as physicians, all concurs (unless with the exception to be noted) to the effect that the inhalation of either of these gases produces nausea, headache, and faintness, soon followed, if the inhalation continues, by unconsciousness. In the language commonly used, the man is "knocked out." This unconsciousness will soon result in death, unless fresh air is inhaled or oxygen artificially supplied. Upon getting fresh air soon enough, there is rapid and complete recovery. The situation is analogous to that caused by a near drowning; the victim within a very brief time either substantially recovers or dies. In case of a partial asphyxiation, not reaching unconsciousness, but at that stage relieved by fresh air, no case has ever been known where there was not a complete recovery in a very short time, or where any results followed of the general character claimed by plaintiff. There have been cases of such results from carbon dioxide poisoning, but they have followed a chronic exposure—where the amount of the gas was small and produced at the time only minimum symptoms or none, but was continued for days or weeks. That such chronic exposure might lead to such a nervous breakdown, while an acute exposure, as plaintiff describes his, would not, according to any known professional experience, induce either the immediate facial eruption or the ultimate nervous collapse, was the unanimous conclusion of all the competent witnesses (unless with the exception noted).

It is true that these were mostly defendant's witnesses, and that they cannot obliterate any prima facie case otherwise made by the plaintiff; but they do furnish a background which will aid in rightly appraising any proof which is said to tend to the contrary. Plaintiff called two medical men; neither one of them undertakes to question the general situation and sum of professional knowledge which had been so stated; and thus the background may be considered as substantially conceded.

[3-6] The possible exception to this unanimity of expert opinion consists in this: One of plaintiff's medical witnesses conceded that he had never known or read of such results from such exposure, and did not venture his professional opinion that plaintiff's described exposure might be the moving cause. He contributed nothing to establishing this step of plaintiff's case. The other medical witness for plaintiff, Dr. Hurst, possibly thought he was giving an opinion which would touch this point, so that it becomes vital to know just what he said to this effect. We assume (no objection having been made) that he sufficiently qualified as an expert, though the mere fact of being a practicing physician might not be enough. It seems probable that such reference to medical authorities as he

made had to do with the chronic, and not with the acute, case, and hence they were clearly immaterial. We cannot find that he undertook to give his opinion on the very point as it existed at the time of the trial, and as it might have been developed by hypothetical question, and which then could have been tested on cross-examination. He stated: "I thought it possible for his condition [four months after exposure, two years and four months before trial] to have been caused by being overcome by gas in the mine." But he says that he based this opinion on the history of the case as stated to him by plaintiff.

That history necessarily included, we would suppose, all the subjective symptoms which plaintiff claimed from the exposure up to the time of the statement, and any expert opinion based in material part on such subjective symptoms, stated to the doctor to qualify him to testify, cannot be received. B. & O. R. R. v. Mangus (C. C. A. 6) 294 F. 761, 762. The rule would be otherwise as to subjective symptoms stated to a physician to get treatment and cure (Union Pacific v. McMican [C. C. A. 8] 194 F. 393, 395, 114 C. C. A. 311); but it does not appear that this first statement by Baker to the doctor was made to get treatment; later statements, possibly referred to, were made after suit brought, and under circumstances not shown. This witness presented no professional reasons for his conclusion, nor theory as to how or why the results could follow. The record indicates to us either an inability or an unwillingness to ask or to answer, intelligently and clearly, the precisely important question.[2] In such a situation we are satisfied that his testimony, which he perhaps meant, and perhaps did not mean, to be a real expression of his professional opinion upon the point in issue, and which, if so intended, lacked substantial basis in the respect pointed out, constituted at the best, only that scintilla of proof which under the federal rule is not substantial evidence justifying a submission to the jury. Though it may take lodgment in the mind, it is not "fit to induce belief"—"from lack of vitality it fades away."

The judgment must be reversed, and the case remanded for a new trial.

---

[2] Perhaps the most definite thing in the record is: "Q. When a man does not get enough to prove immediately fatal, would it produce nervousness, and probably paralysis, of the lower limb and the arm, and a burning in the limbs? A. Yes, sir." This question does not necessarily involve the element of a single brief experience; indeed, it would seem that it reasonably should be interpreted as referring to a chronic exposure.